IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| CHARLES BYRON STINSON, | ) | |
| on behalf of himself and a class of | ) | |
| others similarly situated, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:14-CV-334-WKW |
| | ) | [WO] |
| TWIN PINES COAL CO., INC., and | ) | |
| THE AMERICAN COAL | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Before the court are Defendant The American Coal Co.'s ("AMCOAL") motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) and Plaintiff Charles Bryon Stinson's motion to exclude the exhibits attached to AMCOAL's motion.  (Docs. # 9, 18.)  In this diversity, putative-class action, Mr. Stinson has sued AMCOAL for breach of contract.  AMCOAL contends that Mr. Stinson cannot recover on behalf of himself or a putative class because he is neither a party to that contract nor an intended third-party beneficiary.  The motions have been fully briefed.  (Docs. # 10, 13, 17, 18, 22, 25.)  Based upon careful consideration of the arguments of counsel and the relevant law, the court finds that Mr. Stinson does not have standing to sue AMCOAL for breach of

contract because he lacks a legally protected interest in that contract. Because the court does not have the power to entertain this action, dismissal is required under Federal Rule of Civil Procedure 12(b)(1).[1] In light of the Rule 12(b)(1) dismissal, AMCOAL's Rule 12(b)(6) motion is due to be denied as moot. Additionally, Mr. Stinson's motion to exclude (Doc. # 18) is due to be denied.

## I. JURISDICTION AND VENUE

Subject-matter jurisdiction is proper pursuant to 28 U.S.C. § 1441 and the Class Action Fairness Act, codified in part at 28 U.S.C. §§ 1332(d) and 1453. Personal jurisdiction and venue are not contested.

## II. STANDARD OF REVIEW

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) challenges the court's subject matter jurisdiction. *McElmurray v. Consol. Gov't of Augusta-Richmond Cnty.*, 501 F.3d 1244, 1251 (11th Cir. 2007). On a Rule 12(b)(1) facial attack, the court evaluates whether the plaintiff "has sufficiently alleged a basis of subject matter jurisdiction" in the complaint and employs standards similar to those governing Rule 12(b)(6) review. *Houston v. Marod Supermarkets, Inc.*, 733 F.3d 1323, 1335 (11th Cir. 2013).

---

[1] Although AMCOAL urges dismissal under Rule 12(b)(6), the arguments for and against dismissal are closely akin to the standing inquiry, and, thus, the arguments are helpful to the Rule 12(b)(1) analysis.

When evaluating a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the court must take the facts alleged in the complaint as true and construe them in the light most favorable to the plaintiff.  *Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1321–22 (11th Cir. 2012).  To survive Rule 12(b)(6) scrutiny, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "[F]acial plausibility" exists "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).

In contrast to a facial attack on subject matter jurisdiction, a Rule 12(b)(1) factual attack "challenge[s] the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits, are considered."  *Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990) (internal quotation marks omitted).  When the attack is factual, "the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case."  *Id* .  Therefore, "no presumptive truthfulness attaches to [the] plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims."  *Id.*

For the reasons discussed in Part IV.A., the Rule 12(b)(1) analysis takes the form of a facial challenge.  That challenge also properly includes consideration of the contract at issue, which is appended to AMCOAL's motion to dismiss.

## III.  BACKGROUND

The facts essential to resolution of the motion to dismiss, construed in Mr. Stinson's favor, are as follows.  Beginning in September 2008, Mr. Stinson received high electric bills for properties he owns in Southeast Alabama.  Mr. Stinson blames the increased costs on rate hikes he says resulted from the failure of coal suppliers, including AMCOAL, to abide by their contracts for coal deliveries to PowerSouth Energy Cooperative ("PowerSouth") for electric power generation.

PowerSouth is a "non-profit power generation and transmission cooperative" that sells wholesale power to its member retail electric distribution cooperatives.  (Am. Compl. ¶ 3.)  Hence, "PowerSouth generates power[,] and its member cooperatives distribute that power."  (Am. Compl. ¶ 5.)  Covington Electric Cooperative, Inc. ("CEC"), and South Alabama Electric Cooperative ("SAEC"), as member cooperatives, purchase electricity from PowerSouth.  (Am. Compl. ¶ 9.)  CEC and SAEC are "non-profit member-owned[,] retail electric distribution cooperatives" that serve rural communities in south Alabama, including the communities (Enterprise and Glenwood) where Mr. Stinson owns three parcels of

4

property.  (Am. Compl. ¶¶ 2, 4.)  Mr. Stinson purchases power from CEC and SAEC to service these properties and, thus, is a member of both CEC and SAEC.

Mr. Stinson alleges that, at some point between January 2008 and July 30, 2008, AMCOAL breached a coal supply agreement dated November 1, 2003 ("the Agreement"), between it and PowerSouth by failing to supply coal to PowerSouth in accordance with the Agreement's terms.  (Am. Compl. ¶¶ 7–8.)

AMCOAL's breach of the Agreement "resulted in PowerSouth paying a higher price to other suppliers of coal in order to keep its power plant in production."  (Am. Compl. ¶ 9.)  PowerSouth passed those increased costs to its retail electric distribution cooperatives, including CEC and SAEC, which in turn passed the costs to their own members, including Mr. Stinson, in the form of a 30-percent rate increase, beginning in approximately September 2008.

Mr. Stinson originally filed this action in the Circuit Court of Coffee County, Alabama, on April 30, 2013, against four fictitious Defendants, described as "those persons or entities who or which failed or refused to provide coal in accordance with their contracts with PowerSouth . . . ."  (Compl. ¶ 7.)  On April 7, 2014, Mr. Stinson amended his Complaint to substitute AMCOAL and Twin Pines Coal Co., Inc. ("Twin Pines"), for "Fictitious Defendant A" and "Fictitious

Defendant B."[2]  In the Amended Complaint, Mr. Stinson asserts claims for breach of contract against AMCOAL and Twin Pines on behalf of himself and "[a]ll individual persons in the State of Alabama who were members of cooperatives that were members of PowerSouth and who paid those cooperatives for power from July 30, 2008 to present."  (Am. Compl. ¶ 14.)  Mr. Stinson asserts that he and the putative class "were the intended and direct third party beneficiaries" of the Agreement and incurred damages as a result of AMCOAL's breach.  (Am. Compl. ¶¶ 6, 10.)

AMCOAL timely removed this action to federal court as one arising under the court's original diversity jurisdiction under CAFA and 28 U.S.C. § 1441, and filed the pending Rule 12(b)(6) motion to dismiss.  In support of its motion to dismiss, AMCOAL submitted as exhibits the Agreement and its subsequent amendments.  Mr. Stinson opposes the motion to dismiss on the merits and moves to exclude the exhibits from consideration.

## IV.  DISCUSSION

### A.   Mr. Stinson's Motion to Exclude Consideration of Extrinsic Documents

Mr. Stinson argues that discovery may reveal that the Agreement and the subsequent amendments to the Agreement, which are attached to AMCOAL's

---

[2] The Amended Complaint also names Fictitious Defendants C and D.  "As a general matter, fictitious-party pleading is not permitted in federal court."  *Richardson v. Johnson*, 598 F.3d 734, 738 (11th Cir. 2010) (citing *New v. Sports & Recreation, Inc.*, 114 F.3d 1092, 1094 n.1 (11th Cir. 1997)).  No demonstration has been made that an exception to the general rule applies in this case.  The fictitious-party claims are not properly before the court and are disregarded.

motion to dismiss, are not authenticate, and, thus, the documents are not proper for consideration on a motion to dismiss.  AMCOAL responds that "the Agreement need not be verified or authenticated under these circumstances," as Mr. Stinson "has no basis upon which to dispute the authenticity or completeness of the Agreement."  (Doc. # 22, at 6.)  Moreover, AMCOAL has submitted an affidavit from one of the signatories to the Agreement who attests that the Agreement and its amendments are in fact "true and correct."  (B. J. Cornelius's Aff. at 1–2 (Doc. # 22-2).)

Although Mr. Stinson makes his arguments in Rule 12(b)(6) terminology, his arguments also are relevant to whether the Rule 12(b)(1) motion should be treated as a facial or factual attack.  A Rule 12(b)(1) facial-attack mimics a Rule 12(b)(6) challenge, *see Houston*, 733 F.3d at 1335, and under the Rule 12(b)(6) rubric, a "district court may consider an extrinsic document if it is (1) central to the plaintiff's claim, and (2) its authenticity is not challenged."[3] *SFM Holdings*, *Ltd. v. Banc of Am. Sec., LLC*, 600 F.3d 1334, 1337 (11th Cir. 2010).  Another district court has succinctly explained that "[t]he clearest cases for admitting extrinsic documents on a motion to dismiss are those where the plaintiff's complaint alleges a breach of contract or some other contract-related claim, and the plaintiff does not

---

[3] No reason can be discerned why resolution of a Rule 12(b)(1) facial attack should not include consideration of extrinsic documents in the same manner permitted under Rule 12(b)(6).

attach the contract to the complaint." *ABN AMRO, Inc. v. Capital Int'l Ltd.*, No. 04cv3123, 2007 WL 845046, at *6 (N.D. Ill. Mar. 16, 2007).  "In such cases, defendants are allowed to attach the contract to their motion to dismiss, and the court is allowed to consider it as part of the pleadings." *Id.*  Moreover, "a plaintiff cannot defeat consideration of a[n] integral document on a motion to dismiss unless it can offer a factual basis questioning its authenticity." *Oshinsky v. N.Y. Football Giants, Inc.*, No. 09cv1186, 2009 WL 4120237, at *3 (D.N.J. Nov. 17, 2009).

The two requirements for permitting consideration of extrinsic documents on Rule 12(b)(6) review are met and, thus, are appropriate for consideration on Rule 12(b)(1) review.  First, although Mr. Stinson did not attach the Agreement to the Complaint or the Amended Complaint, he does not dispute that the Agreement is "central" to his breach-of-contract claim.  *See SFM Holdings*, 600 F.3d at 1337. Indeed, the Agreement is at the heart of Mr. Stinson's claim against AMCOAL, for the claim is that AMCOAL breached the Agreement between it and PowerSouth by failing to supply coal to PowerSouth in accordance with the Agreement's terms and that Mr. Stinson is a third-party beneficiary to that Agreement.  (Am. Compl. ¶ 7.)  Second, AMCOAL submits an affidavit authenticating the Agreement and its amendments.  Mr. Stinson offers no factual basis for questioning the documents'

authenticity, and his assertion that perhaps discovery will show that documents are not authentic is insufficient to prevent the court from considering the Agreement.

Accordingly, for purposes of AMCOAL's motion to dismiss, the Agreement and its amendments are presumed authentic and properly are part of the Rule 12(b)(1) analysis.  Mr. Stinson's motion to exclude is due to be denied.

## B.   <u>AMCOAL's Motion to Dismiss</u>

AMCOAL briefs the issue of Mr. Stinson's status as a third party beneficiary as a challenge to the sufficiency of the Amended Complaint's allegations to state the elements of a breach-of-contract claim pursuant to Rule 12(b)(6); however, at the same time, it argues that Mr. Stinson "has no standing to sue AMCOAL for breach of contract" as he is not a third-party beneficiary to the contract.  (Doc. # 10, at 2.)  For its standing argument, AMCOAL relies upon Alabama case law providing that "[a] third person has no rights under a contract between others," and "no standing to enforce" the contract, "unless the contracting parties intend that the third person receive a direct benefit enforceable in court."  *Russell v. Birmingham Oxygen Serv., Inc.*, 408 So. 2d 90, 93 (Ala. 1981).

"Where, as here, jurisdiction is predicated on diversity of citizenship, a plaintiff must have standing under both Article III of the Constitution and applicable state law in order to maintain a cause of action."  *Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 173 (2d Cir. 2005);

*see also Avenue CLO Fund Ltd. v. Bank of Am., NA*, 709 F.3d 1072, 1077 (11th Cir. 2013) (citing *Mid-Hudson* for the aforementioned principle).   AMCOAL raises a potential problem with respect to state-law standing, although it focuses the bulk of its argument on Rule 12(b)(6) pleadings deficiencies rather than on justiciability concerns.   And, although AMCOAL does not mention Article III standing, this court is obliged to address it.   *See Bochese v. Town of Ponce Inlet*, 405 F.3d 964, 968 (11th Cir. 2005).   For the reasons that follow, Mr. Stinson fails to demonstrate that he has standing to sue AMCOAL for breach of contract.

To establish standing for Article III purposes, Mr. Stinson must show, among other things, that he has a "legally protected interest" in the Agreement that AMCOAL injured.   *See id.* at 980.   In this diversity, breach-of-contract action, the standing analysis converges under Article III and state law because "[t]he question of whether, for [Article III] standing purposes, a non-party to a contract has a legally enforceable right therein is a matter of state law."   *Id.* at 981.   In other words, the court looks to Alabama law to determine if Mr. Stinson has a legally protected interest in the Agreement that allows him to sue AMCOAL.

Under Alabama law, "one who seeks recovery in contract as a third-party beneficiary must establish that the contract was intended for his direct, as opposed to incidental, benefit."   *Zeigler v. Blount Bros. Constr. Co.*, 364 So. 2d 1163, 1166 (Ala. 1978).   Conversely, "[i]f the benefit to the third person is not intended to be a

direct benefit, but rather to be merely an incidental benefit, the third person will not be entitled to damages based on a breach of that contract." *Collins Co. v. City of Decatur*, 533 So. 2d 1127, 1132 (Ala. 1988). "[T]o ascertain the intent of the parties, [the court] must first look to the contract itself, because while the intention of the parties controls in construing a written contract, the intention of the parties is to be derived from the contract itself where the language is plain and unambiguous." *Locke v. Ozark City Bd. of Educ.*, 910 So. 2d 1247, 1251 (Ala. 2005) (citation, internal quotation marks, and alterations omitted). "The court's inquiry may stop when it determines from the face of the contract that the parties did not intend to confer upon the third person a direct benefit." *Custer v. Homeside Lending, Inc.*, 858 So. 2d 233, 249 (Ala. 2003). "It is only where a contract provision is found to be ambiguous that it may become necessary to consider the surrounding circumstances and the construction the parties gave the language in order to determine the intent of the contracting parties." *H.R.H. Metals, Inc. v. Miller*, 833 So. 2d 18, 24 (Ala. 2002); *see also Collins Co.*, 533 So. 2d at 1132 ("[C]ourts must look to the surrounding circumstances of the transaction only when the contract is unclear as to whether the contracting parties intentionally conferred upon a third person a direct benefit.").

AMCOAL contends that the Agreement is plain that it does not provide a direct benefit to Mr. Stinson, as an electricity consumer, but rather "*directly*

benefit[s] PowerSouth alone."  (Doc. # 10, at 7.)  AMCOAL argues that this case "is exactly like" *Zeigler*.  (Doc. # 10, at 7 (citing *Zeigler*, 364 So. 2d at 1163).)  In *Zeigler*, customers of Alabama Power Company ("APCO"), who incurred higher bills for electricity after APCO's dam collapsed, sued APCO and its contractors for breach of contract, alleging that proper construction of the dam would have resulted in lower electricity bills for APCO's customers.  The customers sought recovery under the theory that they were third-party beneficiaries of APCO's contracts for the construction of the dam.  *See Zeigler*, 364 So. 2d at 1164–65.  The Supreme Court of Alabama affirmed the judgment dismissing the third-party beneficiary, breach-of-contract claim.  *See id.* at 1168.

As to the contracts themselves, the Supreme Court of Alabama observed that the contracts made "[n]o reference . . . to any third parties," and nothing contained in the[ ] contracts . . . suggest[ed] that in their making [APCO] was directly concerned with the amount of money subscribers for electrical power would be charged each month."  *Id.* at 1166.  Rather, "[p]erformance of the contracts would, and did, result in an enhancement of APCO's real and riparian property holdings, to the direct benefit of the corporation itself."  *Id.*  The Supreme Court of Alabama concluded that, "[a]t best, . . . the plaintiffs are not direct, but only incidental beneficiaries who claim the loss of an economic benefit based upon the alleged

failure of a promised performance by a party contractually bound to another." *Id.*
The court explained that

> while it might be necessary for APCO to construct dams (or to
> purchase a multitude of other services) in order to establish or
> maintain a hydroelectric network so that its utility business might
> serve members of the plaintiffs class, nevertheless the existence of
> those contracts does not Ipso facto make all subsequent purchasers of
> the end product the direct beneficiaries of the promised performances
> simply because they have an ultimate economic interest in those
> performances.

*Id.* at 1167.

On the other hand, Mr. Stinson contends that this case is more analogous to

*Harris v. Board of Water and Sewer Commissioners of City of Mobile*, 320 So. 2d

624 (Ala. 1975), and *Davidson v. Marshall-DeKalb Electric Co-operative*, 495 So.

2d 1058 (Ala. 1986).   In *Harris*, a fire ignited at the plaintiff's motel and

restaurant.   The fire department responded, but the closest hydrants were dry.

With no water to extinguish the fire, the motel and restaurant burned completely.

The plaintiff sued the Board of Water and Sewer Commissioners of Mobile which

had contracted with the City of Mobile "to provide fire hydrants and to maintain an

adequate supply of water for the proper functioning of those hydrants." 320 So. 2d

at 626.  The Supreme Court of Alabama held that the plaintiff could maintain his

breach-of-contract claim against the board under a third-party-beneficiary theory:

> In our present situation, how can it be said that [the plaintiff] is not the
> very party for whose benefit the contract was made?  We agree that
> the City itself enjoys some degree of direct benefit from their contract

with the Board since its own property is protected.  But, in the end, the most direct benefit inures to the people of the City, like [the plaintiff], who rely on these city-provided services for the protection of their property.  This is not to say that the Board is an insurer against all fire losses, but it should be answerable to all those who are injured by its breach of the contract to supply water or its negligent maintenance of nonfunctioning fire hydrants where damage results proximately therefrom.  We find that the facts alleged are sufficient to show that benefits of the contract in question flow to [the plaintiff], and thus make him a third-party beneficiary entitled to sue on the contract for its breach.

*Id.* at 628.

In *Davidson*, the plaintiffs, owners of a mobile home park, received electric power from a non-profit electric cooperative.  The plaintiffs sued the cooperative, alleging that its change in billing practices, which made the owners responsible for the electric bills of the park's tenants, breached the contract between the cooperative and the Tennessee Valley Authority ("TVA").  The Alabama Supreme Court held that the plaintiffs were intended third-party beneficiaries of the cooperative's contract with the TVA based upon an express clause in the contract stating that the cooperative's "operation of an electric system and TVA's wholesale service thereto are for the benefit of the consumers of electricity."  495 So. 2d at 1060 (emphasis omitted).

After careful consideration of the authorities relied upon by the parties, the court finds that this case is more comparable to *Zeigler* than it is to *Harris* and *Davidson*.  The Agreement governs PowerSouth's purchase of coal from

14

AMCOAL. It is, as the title designates, a "Coal Supply Agreement." The Agreement sets out the terms for the sale and shipment of coal and specifies the requirements in terms of the quantity, price, and quality of the coal. There is no provision in the Agreement that refers to a third party whom PowerSouth and AMCOAL intended to benefit directly from PowerSouth's acquisition of coal. In fact, the Agreement mentions neither PowerSouth's power-generation operations nor its relationship with its retail electric distribution cooperatives nor the ultimate consumers of the electricity.

There was the potential, of course, that a breach of the Agreement by AMCOAL would force PowerSouth to have to pay a higher price for its coal from another supplier and that down the line – after PowerSouth used the coal to carry out its power-generation operations and provided that power to its member retail electric distribution cooperatives – the breach could result in increased electricity bills for consumers. But this potentially adverse economic effect on the end user is too far downstream to infer from this Agreement that AMCOAL and PowerSouth entered into a coal-supply agreement with the intention that Mr. Stinson and other electricity consumers benefit directly from that Agreement. The Agreement is plain – through its omission of any reference to third parties, much less to electricity consumers – that it was not formed for the direct benefit of Mr. Stinson. Rather, at best, Mr. Stinson and his proposed class of Plaintiffs are "only incidental

beneficiaries who claim the loss of an economic benefit based upon the alleged failure of a promised performance by a party contractually bound to another." *Zeigler*, 364 So. 2d at 1166. Mr. Stinson is not, therefore, an intended third-party beneficiary to the Agreement.

Mr. Stinson argues that *Harris* should control the outcome, not *Zeigler*, but *Harris* is distinguishable. In *Harris*, the plaintiffs directly received the services the board provided pursuant to its contract with the City of Mobile. Namely, the board's agreement to keep the city's hydrants supplied with water provided the direct benefit of fire protection for the plaintiffs, who were city business owners. Here, the Agreement was for the sale of coal, and PowerSouth received the direct benefit by the purchase of this natural resource, as the coal allowed PowerSouth to carry out its power-generation operations. The benefit that accrued to Mr. Stinson was not direct. It did not accrue until after PowerSouth used the coal to generate electric power and sold that power to its member retail electric distribution cooperatives, which then re-sold the power to Mr. Stinson. In other words, before Mr. Stinson could benefit from the Agreement, the natural resource PowerSouth purchased from AMCOAL had to be converted into electricity and then sold twice, first to CEC and SAEC, and then finally to Mr. Stinson. At best, Mr. Stinson was a remote, indirect user of a twice-sold, converted natural resource.

16

Mr. Stinson also argues that *Zeigler*'s analysis is inapposite because APCO is a for-profit organization and PowerSouth is a non-profit organization. Mr. Stinson emphasizes that for-profit organizations "are allowed to act in self-interest and reap the financial benefit of their contracts, but non-profit cooperatives are not." (Doc. # 17, at 10.) Hence, according to Mr. Stinson, "[a]ny benefit flowing to PowerSouth from a contract was automatically a benefit to the ultimate consumer of its electricity." (Doc. # 17, at 10.) AMCOAL counters that to accept Mr. Stinson's premise would be to "transform him and every other member of a cooperative into an intended third-party beneficiary to each and every contract entered into by that cooperative." (Doc. # 25, at 4.) AMCOAL also points out that, although PowerSouth does not seek "entrepreneurial profit," it still must generate sufficient revenue to compensate employees and construct infrastructure and, in this regard, Mr. Stinson "mischaracterizes an electrical cooperative purpose." (Doc. # 25, at 4.) AMCOAL has the better argument.

It is recognized that Alabama law distinguishes between non-profit and profit corporations in their formation, purposes, and governance, but the authorities on third-party beneficiaries upon which the parties rely also consistently reinforce that the intent of the parties "derive[s] from the contract itself where the language is plain and unambiguous." *Locke*, 910 So. 2d at 1251. For example, the *Davidson* case cited by Mr. Stinson involved, as here, a non-profit electric

cooperative, but *Davidson* is distinguishable because the contract between the electric cooperative and the TVA included express, plain, and unambiguous language that the parties had entered into the contract "for the benefit of the consumers of electricity." *Davidson*, 495 So. 2d at 1060; *see also H.R.H. Metals, Inc.*, 833 So. 2d at 25 (holding that an injured subcontractor was a third-party beneficiary to the general contractor's building contract because it expressly provided that the general contractor was to "maintain its own safety and health program for its employees, subcontractors, and agents *sufficient to prevent injury or illness to such persons resulting from their presence on the Vulcan premises*"). There is no such express language in the Agreement at issue here.  The Agreement does not reference third parties, does not include an express declaration that it intended to benefit third parties, and does not provide any third party a right to sue to enforce the coal-supply contract. The non-profit/profit distinction between APCO and PowerSouth does not compel a different conclusion than the one reached in *Zeigler* because it is plain that the Agreement confers no right upon Mr. Stinson to sue on the Agreement between AMCOAL and PowerSouth.

Finally, Mr. Stinson argues that the intent of the contracting parties cannot be discerned from the Agreement alone because the Agreement "does not clearly and unambiguously preclude the possibility of a third party beneficiary."  (Doc. # 17, at 6.)  He cites no authority for his argument, however, and support for his

18

argument does not emanate from *Zeigler*, where, as here, the contracts were silent as to third parties.  In *Zeigler*, it was the fact that the contracts clearly did not mention third parties that was decisive.  *See* 364 So. 2d at 1166.  *Zeigler* did not require that a contract include affirmative language rejecting a third party from claiming a beneficiary status.

In short, no provision in the Agreement creates an ambiguity as to whether AMCOAL or PowerSouth intended electrical power consumers, like Mr. Stinson, to be direct beneficiaries of the Agreement.  And, as stated, under Alabama law, "[i]t is only where a contract provision is found to be ambiguous that it may become necessary to consider the surrounding circumstances and the construction the parties gave the language in order to determine the intent of the contracting parties."  *H.R.H. Metals*, 833 So. 2d at 24.  Accordingly, the court need not look to the surrounding circumstances to ascertain intent.  Based upon the plain and unambiguous terms of the Agreement, Mr. Stinson is not a third party beneficiary to the Agreement.

Because Mr. Stinson is not an intended, third-party beneficiary to the Agreement, he does not have a legally protected interest in the Agreement.  He lacks standing, therefore, to bring a breach-of-contract action against AMCOAL –

in an individual or representative capacity – under both Article III of the U.S. Constitution and state law.  Accordingly, Rule 12(b)(1) dismissal is required.[4]

## V.  CONCLUSION

For the foregoing reasons, it is ORDERED that Mr. Stinson's action against AMCOAL is DISMISSED with prejudice pursuant to Rule 12(b)(1) for lack of subject-matter jurisdiction, that Mr. Stinson's motion to exclude (Doc. # 18) is DENIED, and that AMCOAL's Rule 12(b)(6) motion to dismiss (Doc. # 9) is DENIED as moot.  This lawsuit proceeds as to Mr. Stinson's action against Twin Pines Coal Co., Inc.

DONE this 11th day of September, 2014.

_____
/s/ W. Keith Watkins
CHIEF UNITED STATES DISTRICT JUDGE

---

[4] Even if it is assumed that Mr. Stinson has standing, the Amended Complaint would be subject to dismissal for failure to state a claim pursuant to Rule 12(b)(6).